NATIONAL MEDIATION BOARD
WASHINGTON, D.C.

In The Matter of the )
)
REPRESENATION OF EMPLOYEES ) Case No. R- 7254
)
of )
)
DELTA AIR LINES, INC., )
)

## THE ASSOCIATION OF FLIGHT ATTENDANTS' SUMMPLEMENTAL MOTION FOR BOARD DETERMINATION OF CARRIER INTERFERENCE

Edward J. Gilmartin
Deirdre Hamilton
ASSOCIATION OF FLIGHT
  ATTENDANTS-CWA, AFL-CIO
501 Third Street, N.W.
Washington, D.C. 20001-2797
(202) 434-0577

Robert S. Clayman
Carmen R. Parcelli
Paul E. Knupp III
N. Skelly Harper
GUERRIERI, CLAYMAN, BARTOS &
  PARCELLI, P.C.
1625 Massachusetts Avenue, N.W., Suite 700
Washington, DC 20036-2243
(202) 624-7400
Fax: (202) 624-7420

Counsel for ASSOCIATION OF FLIGHT
  ATTENDANTS-CWA, AFL-CIO

Date: November 23, 2010

EXHIBIT 1

"adequate safeguards ensuring control of ballots both before and after the voting." Labor Union Law and Regulation 264 (William W. Osborne ed., 2003) (citing *Donovan v. Graphic Arts Local 518*, 228 L.R.R.M. (BNA) 2092 (C.D. Ill 1984)). Likewise, the ballot boxes in political elections are never under the unilateral control of an interested party.

In addition, by encouraging voting on company computer systems, Delta challenged Flight Attendants to demonstrate their "faith" in the "Delta family" and implied that the Company would know who failed the challenge. The Board has held that encouraging voters to display their loyalty to the employer constitutes unlawful interference. *Era Aviation*, 27 NMB at 339; *Laker Airways*, 8 NMB at 249. Employees, ultimately, were left with the choice either to decline solicitations to vote at work, which would create the impression that they had something to hide, or to vote at work with the reasonable belief that the employer could determine whether and how they voted.

### III. DELTA INTERFERED WITH THE ELECTION BY BOTH WITHHOLDING AND PROMISING BENEFITS.

In order to influence PMNW Flight Attendants to vote against union representation, Delta made receipt of wage increases contingent upon being or becoming non-union. Delta's discrimination between union and non-union employees in terms of wage increases interfered with employee free choice in two ways. First, PMNW Flight Attendants were punished for their union status when Delta denied to them an otherwise generally available benefit solely and explicitly based on their union status. Second,

Delta improperly influenced these Flight Attendants through promises that they too would soon share in the wage increases if they became non-unionized.

"Just as the offer of benefits during an organizing campaign may constitute improper interference so may the denial of benefits." *Key Airlines*, 16 NMB 296, 310 (1989) (flight attendants seeking to organize denied wage increase extended to other employees). The Board has recognized that the "impact" of such action is "to place the blame on the union for the denial of the pay increase" and "could naturally be expected to be seen as a penalty for showing union support." *Id.* Moreover, courts applying the NLRA have found employer policies that discriminate solely on the basis of union membership "inherently destructive" of employee rights and *per se* unlawful. *Melville Confections, Inc. v. NLRB*, 327 F.2d 689, 691 (7th Cir. 1964) (unlawful to condition participation in profit-sharing plan upon lack of union representation); *see also Kroger Co. v. NLRB*, 401 F.2d 682 (6th Cir. 1968) (same). Similarly, a carrier violates the RLA by imposing "a facially discriminatory policy that penalize[s] employees . . . for no other reason than their decision to unionize." *Atlas Air Inc. v. ALPA*, 232 F.3d 218, 225 (D.C. Cir. 2000) (carrier unlawfully withheld profit-sharing payment from pilots due to selection of union representation).

Thus, Delta plainly sought to punish PMNW Flight Attendants for their union status by adopting a facially discriminatory wage increase. This action also reinforced Delta's message that Flight Attendants should reject AFA representation based upon

"Delta's track record of working together to make improvements to benefit our people and our operation when they need to be made, not just when a contract is up for negotiation." SOF ¶ 7. Delta will likely argue that it had no alternative to its discriminatory pay scheme in light of its prior commitment to increase pay for PMDL Flight Attendants and its decision "to honor the pay, benefits and work rules for pre-merger Northwest employees." SOF ¶ 45. Delta, however, had another alternative. The Company could have gone to AFA to discuss whether a pay increase for PMNW Flight Attendants could be implemented consistent with the CBA or with permission from the Union, but did not. Delta will also likely argue that pay is only one component of compensation and to award pay increases to PMNW Flight Attendants without adjusting other benefits would have conferred a windfall on those employees. However, if Delta's true concern were parity, then the wage increase could have been structured to take that concern into account, with lesser increases available to PMNW Flight Attendants in proportion to their richer benefits package. Instead of these approaches, Delta simply denied any increase to PMNW Flight Attendants plainly as a demonstration that unionization carried a penalty. In addition, PMDL Flight Attendants witnessing the treatment of their unionized colleagues were also likely to draw the conclusion that they would continue to receive better treatment by remaining non-union.

Not content to merely wield a stick by denying benefits, Delta also used the promise of future pay increases of as much as 5% as a carrot to entice PMNW Flight

Attendants to vote against union representation. "The offer of benefits to influence the outcome of an organizing campaign is a violation of the Railway Labor Act." *Laker Airways*, 8 NMB at 251 (citing *Union of Professional Airmen v. Alaska Aeronautical Indus.*, 95 L.R.R.M. (BNA) 2868 (D. Alaska 1977)). The Board has consistently found interference when a carrier "promises to confer benefits in an effort to persuade employees" to reject union representation. *Petroleum Helicopters*, 25 NMB at 232.

Here, Delta conveyed to PMNW Flight Attendants that the pay increase denied to them on October 1, 2010 would quickly be made available to them if they became non-union. The recorded statements of Richard Anderson and Joanne Smith during a conference call on September 16, 2010 delivered this message loud and clear. SOF ¶ 44. In answer to a PMNW Flight Attendant's question whether he would be brought up to the Delta pay scale immediately following the election, Ms. Smith explained that "if the vote is in favor of a direct relationship and no AFA," Flight Attendants could "look to what [Delta had] done in previous work groups that settled representation." *Id.* She specifically invoked the example of Northwest mechanics who "were brought up to the Delta pay increases within the first pay period."[9] *Id.* Mr. Anderson too referred the questioner to what had occurred with other employee groups, including the Simulator Technicians who "voted the IAM off the property," and indicated that wages for these

---

[9] Northwest's mechanics were represented by the Aircraft Mechanics Fraternal Association ("AMFA"). However, on February 25, 2009, AMFA requested that the NMB revoke its certification, and the request was granted. *Northwest Airlines*, 36 NMB 84 (2009). From that point on, PMNW mechanics were unrepresented.

groups were increased "within the very next pay period." *Id.* In particular, he noted that mechanics received "pretty big raises pretty quickly." *Id.*

In two subsequent communications to employees concerning pay increases, Delta again cited the example of the Simulator Technicians. In his September 30, 2010 "Right From Richard" communication, Mr. Anderson emphasized that the Simulator Technicians "who for a second time voted against IAM representation . . . were given pay increases, benefits, and work rule improvements that Delta simulator techs enjoy. And just again, they don't have to pay dues anymore." SOF ¶ 45. The example of the Simulator Technicians was cited yet again in a letter from Anderson regarding pay increases that appeared as a pop-up on DeltaNet on October 1, 2010, the day after the NMB mailed out voting packages to Flight Attendants. SOF ¶ 46. Thus, the promise of a future wage increase if Flight Attendants became non-union was repeated and reinforced.

Apparently, as expressly stated by Mr. Anderson on September 16, he believed that he could not be held accountable for election interference if he only explained what Delta had done with other employees who had become non-union without "directly" indicating what the Company intended to do with PMNW Flight Attendants. He was mistaken in this belief. Any assessment of whether employer speech contains a promise of benefit "'must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick

64

up intended implications of the later that might be more readily dismissed by a more disinterested ear.'" *US Airways v. NMB*, 177 F.3d 985, 991 (D.C. Cir. 1999) (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617 (1969)); *see also Era Aviation*, 27 NMB at 344 (where "letter implicitly linked the rejection of union representation with benefits," laboratory conditions were tainted). PMNW Flight Attendants could not fail to understand the intended implication of the comparison to other work groups that had become non-union and quickly thereafter received wage increases. Delta's coy attempt to skirt an interference claim is unavailing.

Just as PMNW Flight Attendants understood that raises would quickly follow if they became non-union, so too they were made to understand that, as long as Delta had "to honor the pay, benefits and work rules for pre-merger Northwest employees," they would not be included in wage increases. Moreover, in its campaign materials, Delta emphasized that negotiations under the RLA can take many years, suggesting that PMNW Flight Attendants could be left waiting for wage increases for a very long time if AFA prevailed. So the choice was clear, either become non-union and receive an immediate pay increase or remain union and await the outcome of the next, presumably lengthy, round of negotiations.

Following the lead of Delta's highest management, lower level managers also communicated to Flight Attendants that other benefits would be granted or withheld based on the outcome of the election. These threats and promises included instances of

telling Flight Attendants that a free van service to get to work would be taken away if AFA won, that they would receive a $400 raise if they voted "no," that accrued sick leave would be credited by Delta if AFA lost, and that preferable trip trading arrangements would be available if Flight Attendants were not unionized. SOF ¶ 47. Thus, Delta engaged in improper coercion involving wages and benefits at every level of the organization.

IV. **BY MAKING CALLS TO FLIGHT ATTENDANTS' PRIVATE TELEPHONE NUMBERS, LIMITING THEIR ACCESS AND ABILITY TO CAMPAIGN, AND FORCING THEM TO READ COMPANY CAMPAIGN MATERIAL, DELTA FURTHER TAINTED THE LABORATORY CONDITIONS.**

   A. Delta Managers' Widespread Calls To Flight Attendants' Homes Interjected A Further Element Of Intimidation Into The Election Process.

Delta's systematic calls to Flight Attendants on their home phones and cell phones encouraging them to vote constituted unlawful interference. The Board has consistently held that one-on-one discussions with supervisors about the election are inherently coercive. *See, e.g., Aeromexico*, 28 NMB 309, 335 (2001); *Key Airlines*, 13 NMB 153, 163 (1986); *Zantop Int'l Airlines, Inc.*, 6 NMB 834, 836 (1979); *Allegheny Airlines*, 4 NMB 7, 13 (1962). Likewise, supervisor calls to employees' homes interfere with the election by creating the appearance that the carrier is "keeping a close watch on the employees." *Laker Airways*, 8 NMB at 249 (holding that supervisor calls to employees homes inquiring whether they had received ballots constituted interference). Similarly,