UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| NEAL McMAHON, JARROD ANDERSON, MAGGIE GRAY, KEVIN HUGHES, and DANIEL GREY, | Case No. 11-CV-0521 (PJS/SER) |
| Plaintiffs, | |
| v. | MEMORANDUM OPINION AND ORDER |
| DELTA AIR LINES, INC., | |
| Defendant. | |

Robert S. Clayman, Carmen R. Parcelli, GUERRIERI, CLAYMAN, BARTOS & PARCELLI P.C.; and Michael W. Unger, for plaintiffs.

Marianne D. Short, Michelle S. Grant, DORSEY & WHITNEY LLP; and Robert A. Siegel, Chris A. Hollinger, O'MELVENY & MYERS LLP, for defendant.

Delta Air Lines, Inc. ("Delta") and Northwest Airlines, Inc. ("Northwest") merged in 2008. Prior to the merger, Northwest flight attendants were unionized, and Delta flight attendants were not. Delta flight attendants were also paid better than Northwest flight attendants.

In 2010, all of Delta's flight attendants — including both those who had been employed by Delta and those who had been employed by Northwest — voted not to be represented by the Association of Flight Attendants-CWA, AFL-CIO ("AFA"), which had represented the former Northwest flight attendants. The AFA accused Delta of unlawfully interfering with the election

and asked the National Mediation Board ("the Board") to investigate.[1]  The Board agreed, and its investigation is ongoing.

The central issue in this lawsuit is whether, while the Board is investigating the AFA's challenge to the election, the pay and benefits of the former Northwest flight attendants should be raised to match the pay and benefits of the former Delta flight attendants.  The plaintiffs in this action — all of whom are former Northwest flight attendants — argue that, in the aftermath of the election, the law permits their compensation to be aligned with the compensation of former Delta flight attendants and that Delta has acted unlawfully in refusing to compensate the two groups equally.  Delta argues that, while the AFA's challenge to the election remains pending, the law forbids the compensation of the two groups of flight attendants to be aligned.

Plaintiffs bring this action under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq., alleging that, by refusing to align their compensation with the compensation of the former Delta flight attendants, Delta has violated their rights under § 2, Third and Fourth of the RLA. 45 U.S.C. § 152, Third and Fourth.  This matter is before the Court on plaintiffs' motion for a preliminary injunction and on Delta's motion to dismiss or, in the alternative, to strike.  For the reasons set forth below, the Court denies plaintiffs' motion for a preliminary injunction, denies Delta's motion to dismiss, and grants Delta's motion to strike.

## I. BACKGROUND

Delta merged with Northwest on October 31, 2008.  Am. Compl. ¶ 17.  At the time of the merger, Northwest flight attendants were represented by the AFA and were compensated under

---

[1]The National Mediation Board was established by the Railway Labor Act and, among other things, is responsible for certifying the collective-bargaining representative (if any) of workers who are covered by the RLA.  *See* 45 U.S.C. § 152, Ninth.

the terms of a collective-bargaining agreement ("CBA").  Am. Compl. ¶¶ 2-3.  Northwest flight

attendants earned less than their Delta counterparts, who were not unionized.  Am. Compl. ¶ 3.

When the two airlines merged, Northwest flight attendants became employees of Delta.[2]

Am. Compl. ¶ 17.  But the AFA remained the bargaining representative of the Northwest flight

attendants and the CBA remained in effect as to those flight attendants.  Am. Comp. ¶ 18.  As a

result, the Northwest flight attendants were paid less than the Delta flight attendants, even though

all of the flight attendants were now doing the same work for the same company.

On July 1, 2010, the AFA asked the Board to conduct an election to determine whether

the newly combined group of Delta and Northwest flight attendants would be represented by a

union.  Am. Compl. ¶¶ 19-20.  The Board granted the request and scheduled a voting period from

September 29 to November 3, 2010.  Am. Compl. ¶ 20.  The AFA lost the election by a vote of

9,544 to 9,216.  Am. Compl. ¶ 21.  Based on those results, the Board extinguished the AFA's

certification as the representative of the Northwest flight attendants — and, as a result, the

Northwest CBA is no longer in effect.  Am. Compl. ¶ 21.  But Delta nevertheless continues to

compensate the Northwest flight attendants under the terms of the CBA, thus maintaining the

disparity between the compensation paid to Northwest flight attendants and the compensation

paid to Delta flight attendants.  Am. Compl. ¶ 23.

Several weeks after the election, the AFA asked the Board to investigate whether Delta

had unlawfully interfered with the election.  Am. Compl. ¶ 24.  The Board had not acted on the

AFA's interference claims as of the date that the plaintiffs filed their amended complaint in this

---

[2]For ease of reference, the Court will refer to flight attendants who worked for Northwest
at the time of the merger as "Northwest flight attendants" and flight attendants who did not work
for Northwest at the time of the merger as "Delta flight attendants."

action.  But the parties have since informed the Court that the Board has decided to investigate the AFA's interference claims.  *See* Bowman Decl. Ex. D.  As far as the Court knows, the Board's investigation is ongoing.

In December 2010, the AFA asked Delta to align the wages of all flight attendants and offered to waive any election-interference claims related to such alignment.  Am. Compl. ¶ 25. Delta replied that it would not align the flight attendants' wages unless the AFA withdrew its interference claims pending before the Board.  Am. Compl. ¶ 26.

In January 2011, Delta announced a profit-sharing distribution for flight attendants.  Am. Compl. ¶ 27.  Delta said that the Delta flight attendants would receive approximately 6.5 percent of their eligible earnings, while the Northwest flight attendants would receive approximately 3.2 percent of their eligible earnings (an amount calculated according to the profit-sharing formula in the terminated CBA).  Am. Compl. ¶ 27.  The AFA asked Delta to pay Northwest flight attendants the higher rate and offered to waive any election-interference claims related to that payment.  Am. Compl. ¶ 30.  Delta refused and stated that it would align the profit-sharing pay of the flight attendants only if the AFA withdrew its pending interference claims.  Am. Compl. ¶ 31.

On February 14, 2011, Delta issued the profit-sharing checks.  Consistent with Delta's earlier announcement, the Northwest flight attendants received less than half of the amount paid to the Delta flight attendants.  Am. Compl. ¶ 32.  On that same day, the AFA once again told Delta that if Delta aligned the pay, benefits, and work rules of all flight attendants, the AFA would waive any potential interference claims related to that alignment.  Am. Compl. ¶ 33.  Delta again refused.  Am. Compl. ¶ 34.

Delta continues to pay the Northwest flight attendants less than the Delta flight attendants, and Delta has made clear that it will maintain the disparity until the AFA withdraws its challenge to the election or the AFA's challenge is fully and finally resolved by the Board. Needless to say, the Northwest flight attendants are unhappy at being paid less than the Delta flight attendants, and at least some of the Northwest flight attendants appear to blame the AFA for their plight. According to the amended complaint, a number of the Northwest flight attendants have told the AFA that they will not support the AFA in any new representation election unless the AFA withdraws its interference claims against Delta. Am. Compl. ¶ 37.

## II.  ANALYSIS

### A.  Motion to Dismiss

#### 1.  Standard of Review

Delta moves to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. In ruling on a motion to dismiss for lack of subject-matter jurisdiction, the court is free to weigh the evidence and decide whether that evidence establishes that it has jurisdiction. *See Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). In ruling on a motion to dismiss for failure to state a claim, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider exhibits attached to the complaint and documents that are

necessarily embraced by the complaint without converting the motion into one for summary judgment.  *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).  To survive a Rule 12(b)(6) motion, a plaintiff must do more than offer "labels and conclusions" or a "formulaic recitation of the elements of a cause of action . . . ."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Instead, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  *Id.*

## 2.  Comity

In this lawsuit, plaintiffs allege that Delta is interfering with its flight attendants' decision about whether to unionize by refusing to align compensation for the Northwest and Delta flight attendants, by blaming the AFA for the resulting disparity, and by conditioning alignment on the withdrawal of the AFA's interference claims.  Delta moves to dismiss plaintiffs' complaint, arguing that, because the Board is presently considering the same or similar allegations of interference, the Court should decline to exercise jurisdiction over plaintiffs' claims.[3]  To understand Delta's argument, it is first necessary to understand the scope of both (1) the Board's jurisdiction over the AFA's interference claims, and (2) this Court's jurisdiction over plaintiffs' interference claims.

### a.  Authority of the Board

Under § 152, Ninth, the Board has exclusive jurisdiction to resolve representation disputes — that is, disputes over which union, if any, will represent employees for purposes of

---

[3]Although Delta cites Fed. R. Civ. P. 12(b)(1), Delta frames its argument in terms of comity rather than as a straightforward challenge to jurisdiction.  Nevertheless, because Delta's argument implicates this Court's jurisdiction, the Court has treated it as a jurisdictional challenge and has considered matters outside the complaint.

collective bargaining.  *See Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 300 (1943);

*Indep. Fed'n of Flight Attendants v. Cooper*, 141 F.3d 900, 902 (8th Cir. 1998) ("The Mediation

Board's power to resolve representation disputes under the RLA is exclusive.").[4]  When the

Board is presented with a representation dispute, it is required to investigate the dispute, but it

has broad discretion to determine how to conduct its investigation:

> In such an investigation, the Mediation Board shall be authorized
> to take a secret ballot of the employees involved, or to utilize any
> other appropriate method of ascertaining the names of their duly
> designated and authorized representatives in such manner as shall
> insure the choice of representatives by the employees without
> interference, influence, or coercion exercised by the carrier.

45 U.S.C. § 152, Ninth.

When presented with a representation dispute, then, the Board essentially has two

functions: (1) selecting the method by which employees will decide whether to be represented by

a union so as to ensure that the employees' choice will be free from interference, influence, or

coercion by the employer; and (2) certifying the chosen representative, if any.  *See Switchmen's*

*Union*, 320 U.S. at 304 (noting that "[t]he Mediation Board makes no 'order'" and "its only

ultimate finding of fact is the certificate").

The Board has little ability to directly regulate employer conduct.  *See Aircraft Mech.*

*Fraternal Ass'n v. United Airlines, Inc.*, 406 F. Supp. 492, 502-03 (N.D. Cal. 1976).  Rather, the

---

[4]The Supreme Court has recognized a very limited form of judicial review of Board decisions in representation disputes.  *See Bhd. of Ry. & S.S. Clerks v. Ass'n for the Benefit of Non-Contract Emps.*, 380 U.S. 650, 661 (1965) (a court may review the Board's resolution of a representation dispute "only to the extent that it bears on the question of whether it performed its statutory duty to 'investigate' the dispute"); *see also IAM v. Trans World Airlines, Inc.*, 839 F.2d 809, 811 (D.C. Cir.) ("Judicial review of NMB decisions is one of the narrowest known to the law."), *amended by* 848 F.2d 232 (D.C. Cir. 1988) (per curiam).

Board regulates employer conduct indirectly by exercising its authority to set aside a tainted

election and schedule a new election.  In theory, the Board could continue to set aside tainted

elections and schedule new elections forever.  *Id.* at 503 ("The Board will continue to set aside

elections tainted by improper influence until such time as the offending practice ceases.");

Charles J. Morris, *A Tale of Two Statutes: Discrimination for Union Activity under the NLRA*

*and RLA*, 2 Emp. Rts & Emp. Pol'y J. 317, 336 (1998) ("because of the NMB's limited

jurisdiction, [employer interference] can only be treated as grounds for setting aside an election

and ordering a new election or alternative means to establish representation").  The Board has

broad discretion to create balloting and other procedures to counteract any taint.  *See, e.g.*,

*Aerovias de Mexico, S.A., de C.V. v. Nat'l Mediation Bd.*, 211 F. Supp. 2d 1, 3 n.2 (D.D.C. 2002)

(describing different kinds of ballots and procedures used by the Board).

### b.  Authority of this Court

Plaintiffs bring their claims under 45 U.S.C. § 152, Third and Fourth.  These subsections

provide, in relevant part:

**Third.  Designation of representatives**

Representatives, for the purposes of this chapter, shall be
designated by the respective parties without interference, influence,
or coercion by either party over the designation of representatives
by the other; and neither party shall in any way interfere with,
influence, or coerce the other in its choice of representatives.
Representatives of employees for the purposes of this chapter need
not be persons in the employ of the carrier, and no carrier shall, by
interference, influence, or coercion seek in any manner to prevent
the designation by its employees as their representatives of those
who or which are not employees of the carrier.

**Fourth.  Organization and collective bargaining; freedom from
interference by carrier; assistance in organizing or maintaining**

**organization by carrier forbidden; deduction of dues from wages forbidden**

Employees shall have the right to organize and bargain collectively through representatives of their own choosing.  The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter.  No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

The RLA does not expressly state that these provisions are judicially enforceable, but the Supreme Court long ago held that there is an implied right of action under § 152, Third to enforce its prohibition against interference, influence, and coercion.  *See Tex. & New Orleans R.R. Co. v. Bhd. of Ry. & S.S. Clerks*, 281 U.S. 548, 568-70 (1930).[5]  Thus, although the Board can regulate employer conduct only indirectly by voiding elections, this Court can regulate employer conduct directly by enjoining acts that would violate § 152, Third and Fourth.

Given the somewhat overlapping distribution of power between the judiciary and the Board, there are times in which a court's power to enforce § 152, Third and Fourth comes into conflict with the Board's power to resolve representation disputes.  When that happens, the court

---

[5]Section 152, Fourth (in its current form) and Ninth were added to the statute in 1934, after the Supreme Court decided *Texas & New Orleans Railroad Company*.  Act of June 21, 1934, ch. 691, 48 Stat. 1185.  In 1943, the Supreme Court held that, in view of the Board's powers under § 152, Ninth, there was no need to imply a cause of action to enforce employees' right under § 152, Fourth to have the "majority of any craft or class of employees . . . determine who shall be the representative of the craft or class . . . ."  *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 300-01 (1943).  But lower courts have recognized an implied cause of action to enforce § 152, Fourth's prohibition against employer interference, influence, and coercion.  *See, e.g.*, *Bhd. of Locomotive Eng'rs v. Kan. City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994).

must give way to the Board.  In particular, the court must not exercise jurisdiction if doing so would have the effect of determining the representation dispute.  *Texidor v. Ceresa*, 590 F.2d 357, 359-60 (1st Cir. 1978) (dismissing claims under § 152, Third for lack of jurisdiction because they raised a representation dispute within the Board's exclusive jurisdiction); *cf. Indep. Fed'n of Flight Attendants v. Cooper*, 141 F.3d 900, 903 (8th Cir. 1998) (finding state-law claims preempted under the RLA because "an award of damages would be the functional equivalent of resolving the representation dispute"); *Int'l Bhd. of Teamsters v. Tex. Int'l Airlines, Inc.*, 717 F.2d 157, 161 (5th Cir. 1983) ("A court may not entertain an action involving [a representation] dispute even if it arises in the context of otherwise justiciable claims.").

With these principles in mind, the Court now turns to Delta's argument that, because the Board is presently considering the AFA's election-interference claims, this Court should decline to exercise jurisdiction over the claims brought by plaintiffs in this lawsuit.

### c. Delta's Argument

To begin with, it is important to note that the parties' dispute before this Court is not a representation dispute.  Plaintiffs are not challenging a Board certification, seeking to have this Court certify a representative, or asking this Court to set aside the November 2010 election. Instead, plaintiffs are claiming that Delta is currently discriminating against them on the basis of their past union status.  Plaintiffs' claims are thus similar to the garden-variety discrimination claims over which courts regularly exercise jurisdiction under § 152, Third and Fourth.  *See, e.g.*, *Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 226 (D.C. Cir. 2000) (reversing summary judgment for employer where employer "selectively penalize[d] unionized employees so as to interfere with, coerce, or influence their decision to exercise their rights under the RLA").

The complication in this case is that, at the same time that plaintiffs are before this Court complaining of alleged discrimination by Delta on the basis of their past union status, the union that represented plaintiffs in the past is before the Board complaining of Delta's alleged interference in the November 2010 election.  The relevant question, then, is whether this Court's exercise of jurisdiction over plaintiffs' discrimination claims would have the effect of resolving the representation dispute before the Board.

The Court finds that it would not.  In the Board proceedings, the AFA is seeking to have the result of the November 2010 election set aside on the ground that the election was tainted by (among other things) Delta's *pre*-election grant of pay raises to the non-unionized Delta flight attendants and its refusal to grant comparable pay raises to the unionized Northwest flight attendants.  Here, plaintiffs are challenging Delta's refusal, *after* the election, to align the compensation of the no-longer-unionized Northwest flight attendants with the compensation of the never-unionized Delta flight attendants.[6]  Clearly, then, the conduct being challenged by plaintiffs in this action is not the same as the conduct being challenged by the AFA before the Board — and because the conduct being challenged by plaintiffs in this action occurred *after* the challenged election, it could not possibly have tainted the election that the Board is now investigating.  Therefore, this Court's resolution of plaintiffs' interference claims will not have

---

[6]The AFA has apparently kept the Board informed of Delta's post-election conduct.  *See, e.g.*, Gilmartin Decl. Ex. 2 (letter from Delta to AFA noting that "you filed your letter [about the disparity in pay rates] with the National Mediation Board"); *Id.* Ex. 4 (letter from Delta to AFA noting that "you filed your letter [about the unequal profit-sharing distribution] with the National Mediation Board").  But it is not clear how — or even whether — Delta's post-election conduct will play any part in the Board's resolution of the AFA's interference claims.

the effect of resolving the AFA's interference claims or otherwise calling into question either the results of the election or any decision that the Board makes about that election.

Delta contends, however, that the Court should decline to exercise jurisdiction because Delta is asserting the same defense to both sets of interference claims. Specifically, Delta is arguing both before this Court and before the Board that it was required to maintain separate compensation systems by virtue of the Board's requirement that elections be conducted under "laboratory conditions."

"Laboratory conditions" is essentially a term of art that the Board uses to describe an election atmosphere that is free of interference, influence, or coercion. *See Zantop Int'l Airlines, Inc.*, 6 N.M.B. 834, 835 (1979) ("The Board seeks to promote 'laboratory conditions' in conducting representation elections."); *Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1133 (9th Cir. 2000) ("The atmosphere required for [representation elections] is characterized by what the NMB calls 'laboratory conditions.'"). Granting or withholding benefits in order to influence an election may interfere with laboratory conditions and therefore provide the basis for an interference charge. *Mercy Air Serv., Inc.*, 29 N.M.B. 55, 73 (2001).

As a general matter, the Board requires that laboratory conditions be maintained from the date that the employer becomes aware of the organizing drive until the date that the election concludes. *Delta Air Lines, Inc.*, 37 N.M.B. 281, 286 (2010). But if the election results are challenged, the Board requires that laboratory conditions continue to be maintained during the pendency of the challenge. *Stillwater Cent. R.R.*, 33 N.M.B. 100, 106 (2006); Bowman Decl. Ex. B (letter from Board reminding the parties to maintain laboratory conditions during the pendency of interference charges and any new election). Thus, says Delta, even though plaintiffs

are challenging conduct that occurred after the election, the Court will nevertheless be called on to interpret and apply the very same laboratory-conditions requirement that is at issue in the Board proceedings.

Delta is incorrect for two reasons:

First, unlike the Board, this Court does not, in fact, have to decide what laboratory conditions require.  The Board must decide whether Delta's pre-election pay raises to the Delta flight attendants and its corresponding refusal to give the same pay raises to the Northwest flight attendants in fact violated laboratory conditions — i.e., actually interfered with or influenced the election.  *Cf. Pinnacle Airlines Corp.*, 30 N.M.B. 186, 214 (2003) ("The issue before the Board is whether laboratory conditions have been tainted, not whether the Carrier's discharge of Crutcher and Mattox was unlawful under the Act.").  Delta's subjective motivation — although not irrelevant to the Board's analysis — is not conclusive.  *See Delta Air Lines, Inc.*, 37 N.M.B. 281, 309 (2010) (finding that the announcement and timing of a wage increase tainted laboratory conditions even though airline proved that the increase was planned before the organizing drive); *Am. W. Airlines, Inc.*, 17 N.M.B. 79, 98-99 (1990) (finding interference where employer's distribution of checks during election period "show[ed] careless disregard of [the] Act's requirements at best and a serious violation of those same provisions at worst").  Ultimately, the Board's focus will be on the election, and not on what was in Delta's head.

In this case, however, the Court's focus *will* be on what was in Delta's head when, after the election, Delta decided to continue to pay the Northwest flight attendants differently from the Delta flight attendants.  As the Court explains below, if Delta was motivated by anti-union animus, then it can be held liable.  But if Delta was not motivated by anti-union animus — if

-13-

instead it was motivated by a sincere belief that the need to maintain laboratory conditions required it to maintain separate compensation systems — then Delta cannot be held liable, even if Delta's good-faith belief was mistaken.  In short, what this Court needs to decide is not what laboratory conditions *required* of Delta, but what Delta *believed* laboratory conditions required of Delta.

Second, even if the Court is wrong — and even if the Court does have to decide what laboratory conditions actually required of Delta — the question facing the Court would still differ from the question facing the Board.  The Board has to decide what laboratory conditions required *before* the election, when the AFA was representing the Northwest flight attendants and a binding CBA was in effect.  This Court, by contrast, would have to decide what laboratory conditions required *after* the election, when the AFA had been decertified and the CBA was no longer in effect.  Those are very different questions.  To convince the Board that Delta's refusal to give a pay raise to Northwest flight attendants tainted the election, the AFA will have to overcome the argument that Delta was bound by the CBA and that any deviation from the CBA would itself have tainted laboratory conditions.  The plaintiffs in this action face no such obstacle.  Indeed, central to plaintiffs' argument in this case is that, precisely because the CBA was no longer in effect after the election, Delta was free to do what (according to plaintiffs) it had long been claiming that it wanted to do: align the pay of Delta and Northwest flight attendants.

For these reasons, this Court's resolution of plaintiffs' claims will not affect the Board's consideration of the AFA's interference claims and will not have the effect of resolving the

-14-

representation dispute.  The Court therefore rejects Delta's argument that it should abstain from exercising jurisdiction over plaintiffs' claims under § 152, Third and Fourth.

### 3.   Failure to State a Claim

Delta next argues that plaintiffs have failed to state a claim under § 152, Third and Fourth.  According to Delta, plaintiffs' claims boil down to a contention that the RLA required Delta to align its flight attendants' compensation once the union was decertified and the CBA was no longer in effect.  Because the RLA does not impose such a requirement, Delta argues, plaintiffs have failed to state a claim.

Delta mischaracterizes plaintiffs' claims.  Plaintiffs do not claim that the RLA required Delta to align compensation.  Instead, plaintiffs allege that Delta's refusal to align compensation was unlawful because it was motivated by anti-union animus.  Such an allegation states a claim for interference, influence, and coercion under § 152, Third and Fourth.  *See Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 223-24 (D.C. Cir. 2000) ("The RLA bars employers from engaging in discriminatory actions designed to impede or inhibit employees' exercise of their right to organize for collective bargaining purposes.").  Delta's motion to dismiss is therefore denied.

### B.  Motion to Strike

In their complaint, plaintiffs seek an injunction requiring Delta to align not just their compensation, but the compensation of all Northwest flight attendants.  And plaintiffs seek an award of backpay not just for themselves, but for all Northwest flight attendants.  Because plaintiffs did not file this lawsuit as a class action, Delta argues, plaintiffs have no standing to

seek relief on behalf of flight attendants who are not parties.  Accordingly, Delta moves to strike plaintiffs' claims for relief on behalf of the non-party flight attendants.

Plaintiffs argue that they have standing to seek relief for non-party flight attendants because affording relief to those flight attendants is necessary to remedy violations of plaintiffs' own rights.  According to plaintiffs, their rights were violated not only because Delta unlawfully paid *them* less than their Delta counterparts, but also because Delta paid the *other* Northwest flight attendants less than the Delta flight attendants, and thereby violated plaintiffs' right to organize their coworkers without interference, influence, or coercion from Delta.  Plaintiffs argue that Delta's actions have chilled support among plaintiffs' coworkers for unions in general and for the AFA in particular.

The doctrine of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To satisfy the constitutional requirement, a plaintiff must establish that he suffered an "injury in fact" (that is, the invasion of a legally protected interest); a causal connection between the injury and the conduct complained of; and a likelihood that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Even if a plaintiff can establish the constitutional elements of standing, however, he may not be entitled to pursue his claim.  As a rule, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499.

It has been over 80 years since the Supreme Court first recognized an implied cause of action under § 152, and yet, to the best of the Court's knowledge, no court has ever explicitly

-16-

held that an employee may maintain a claim under § 152 based on a violation of another employee's rights. To be sure, it is possible to find cases — such as *Adams v. Federal Express Corp.*, 470 F. Supp. 1356 (W.D. Tenn. 1979) — in which courts have entered broad injunctions prohibiting retaliatory transfers and discharges of non-party employees. But although *Adams* briefly addressed the issue of standing, *Adams* did not explain its implicit holding that an employee may seek an injunction on behalf of non-parties. It may be that the employer in *Adams* did not contest the issue because the employer was not concerned about the scope of the negative injunction being sought in that case — an injunction that simply ordered the employer *not* to do something.

In contrast to *Adams*, plaintiffs here seek an affirmative injunction requiring Delta to pay millions of dollars to thousands of flight attendants who are not parties to this case. Plaintiffs have not cited, and the Court has not found, a single RLA case in which an individual employee was able to obtain a court order awarding monetary or other affirmative relief to a fellow employee who was not a party to the action.[7] Instead, the scant case law on the issue is to the contrary. *See Williams v. ABX Air, Inc.*, No. 06-833, 2007 WL 2886283, at *3 (S.D. Ohio Sept. 27, 2007) ("the Court concludes that the prudential standing doctrine prevents this Court

---

[7]At oral argument, plaintiffs were not able to identify any RLA cases in which a court granted monetary relief to employees who were not parties to the action. Instead, plaintiffs pointed to cases under the National Labor Relations Act ("NLRA") in which the National Labor Relations Board ("NLRB") granted monetary relief to a group of employees. *See, e.g.*, *N.L.R.B. v. Rubatex Corp.*, 601 F.2d 147, 151 (4th Cir. 1979) (upholding an NLRB order to pay the same bonus to strikers that was given to non-strikers because the NLRB has "broad discretion in formulating remedies," there were no practical alternatives, and there was no evidence that the order would have a substantial adverse effect on the company). But such cases only highlight the differences between the NLRA and the RLA. Unlike the NLRB, this Court is not an administrative agency with broad investigative and discretionary powers and institutional expertise in the field of labor relations.

from exercising any jurisdiction over any claims that Plaintiffs may be bringing on behalf of these third parties"); *cf. Int'l Bhd. of Teamsters v. Zantop Air Transp. Corp.*, 394 F.2d 36, 41 (6th Cir. 1968) (declining to consider uncertified union's claims for reinstatement of individual employee "because it involves the private statutory rights of the discharged employee who is not a party to this action").

Therefore, even assuming (without deciding) that plaintiffs have met the constitutional prerequisites for standing, the Court concludes that plaintiffs cannot overcome the prudential bar against asserting claims based on wrongs to — and seeking relief on behalf of — third parties. If plaintiffs' rights under § 152 have been violated, then they can seek monetary relief for themselves. But they cannot seek a court order forcing Delta to pay money to flight attendants who are not parties to this action. Delta's motion to strike plaintiffs' claims for relief on behalf of third parties is granted.

### C. Motion for Preliminary Injunction

Plaintiffs seek a preliminary injunction requiring Delta to: (1) align the compensation structure for its flight attendants; (2) award back pay to Northwest flight attendants from November 4, 2010 onward; and (3) compensate Northwest flight attendants for the difference between the profit-sharing distribution they received in February 2011 and the distribution received by Delta flight attendants. Plaintiffs further seek an injunction prohibiting Delta from conditioning payments to flight attendants on the AFA's withdrawal of the interference charges pending before the Board. As the Court has stricken plaintiffs' claims for relief on behalf of third parties, the Court will consider plaintiffs' motion only with respect to claims for relief on their own behalf.

A court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).[8]

A preliminary injunction is an extraordinary remedy, and the party seeking the injunction bears the burden of establishing the four *Dataphase* factors. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). If a party's likelihood of succeeding on the merits is sufficiently low, a court may deny a preliminary injunction even if the other three factors — irreparable harm, balance of harms, and the public interest — weigh in the party's favor. *See CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) ("the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied"); *Mid-America Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) ("an injunction cannot issue if there is no chance of success on the merits").

---

[8]Delta does not contend that the Norris-LaGuardia Act ("NLA"), 29 U.S.C. §§ 101 et seq., deprives the Court of jurisdiction to enjoin violations of § 152, Third and Fourth. *See Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R.*, 353 U.S. 30, 40 (1957) ("We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved."). In addition, at oral argument, the parties agreed to waive the NLA's requirement of live testimony. *See* 29 U.S.C. § 107. Finally, plaintiffs argue that the NLA's substantive requirements, *see* 29 U.S.C. § 107, are essentially the same as the *Dataphase* factors. *See Nw. Airlines, Inc. v. IAM*, 712 F. Supp. 732, 738 (D. Minn. 1989) (noting similarity between *Dataphase* factors and substantive requirements of § 107). Delta does not object to this characterization and in fact relies on the *Dataphase* factors in its own briefing. The Court therefore applies the *Dataphase* factors.

1.  Likelihood of Success

To determine whether plaintiffs are likely to prevail on their claims that Delta's pay

practices violate § 152, Third and Fourth, it is first necessary to determine the elements of such

claims.[9]  This task is surprisingly difficult.

The relevant statutory language prohibits an employer from "interfer[ing] with,

influenc[ing], or coerc[ing]" employees in their choice of representatives, § 152, Third;

"deny[ing] or in any way question[ing] the right of its employees to join, organize, or assist in

organizing the labor organization of their choice," § 152, Fourth; "interfer[ing] in any way with

the organization of its employees," § 152, Fourth; or "influenc[ing] or coerc[ing] employees in an

effort to induce them . . . not to join or remain members of any labor organization," § 152,

Fourth.  Unlike many other employment and labor-law statutes, this language does not expressly

address discrimination or retaliation and does not seem to require any discriminatory intent on

the part of the employer.  Further muddying the waters, the Eighth Circuit has suggested that

anti-union animus is (at least sometimes) an element of § 152, Third and Fourth cases, but only

in *post*-certification cases (that is, when a union has already been certified):

> We do not hold, however, that causes of action under § 2 Third and
> Fourth are available *only* in precertification cases, but the
> availability of the remedy is limited in postcertification
> circumstances.  This Court has held, in a postcertification case, that
> no cause of action lies under § 2 Third when the complaining party

---

[9]Although plaintiffs also allege that Delta has violated the RLA by publicly blaming the
AFA for Delta's refusal to align compensation, *see* Am. Compl. ¶ 44, plaintiffs do not seek an
injunction prohibiting Delta from making such statements.  Accordingly, the Court does not
consider whether Delta's statements alone violate the RLA even if Delta's pay practices do not.
As discussed below, however, plaintiffs do rely on Delta's statements as evidence of the alleged
anti-union animus underlying Delta's pay practices, and the Court considers the statements in
that context.

> "fail[s] to present adequate evidence that [the railroad's] actions
> have been motivated by anti-union animus or that [the railroad's]
> actions were an attempt to interfere with its employees' choice of
> their collective bargaining representative." *Tello v. Soo Line R.R.*,
> 772 F.2d 458, 462 (8th Cir. 1985). We hold that the same applies
> to an action under § 2 Fourth.

*Bhd. of Locomotive Eng'rs v. Kan. City S. Ry.*, 26 F.3d 787, 795 (8th Cir. 1994). This language

seems to imply that, in a *pre*-certification case (such as this action), evidence of anti-union

animus is *not* necessary. The Eighth Circuit does not say so explicitly, though, and any

implication to that effect is dicta. Moreover, nothing in the language of § 152 suggests such a

distinction. Reflecting that fact, a survey of relevant cases demonstrates that most courts require

a showing of anti-union animus in pre-certification cases — and, indeed, the requirement is often

crucial to the outcome of those cases.[10]  This Court believes that, when squarely confronted with

the issue, the Eighth Circuit will agree with these courts.

Plaintiffs argue that Delta's actions amount to facial discrimination on the basis of past

union membership and that, when such facial discrimination exists, evidence regarding the

motive of the employer becomes irrelevant.  But plaintiffs read too much into the decisions on

which they rely.  In *National Labor Relations Board v. Great Dane Trailers, Inc.*, 388 U.S. 26

(1967), the Supreme Court held that "[s]ome conduct . . . is so inherently destructive of employee

---

[10]  *See Atlas Air, Inc. v. Air Line Pilots Ass'n*, 232 F.3d 218, 224 (D.C. Cir. 2000) ("the real question in this case is whether . . . the carrier has discriminated against its employees because they have engaged in activities protected by the RLA" (citation and quotations omitted)); *Dorsey v. United Parcel Serv.*, 195 F.3d 814, 815-16 (6th Cir. 1999) (noting that the defendant admitted that it transferred and ultimately discharged the plaintiff solely for his union activity and the only question was whether the plaintiff was protected by the RLA); *Stepanischen v. Merch. Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983) ("The basic issue in the case is the state of mind of the employer: did it in fact discharge Stepanischen for an antiunion reason?"); *Adams v. Fed. Express Corp.*, 547 F.2d 319, 322-23 (6th Cir. 1976) (discussing the employer's motives for discharging or transferring the plaintiffs); *Grosschmidt v. Chautauqua Airlines, Inc.*, 122 L.R.R.M. (BNA) 3254, 1986 WL 10077, at *4 (N.D. Ohio 1986) ("To establish her claim of unlawful termination, plaintiff must prove that defendant discharged her because of an anti-union animus."); *Scott v. Am. Airlines, Inc.*, 488 F. Supp. 415, 419-20 (E.D.N.Y. 1980) (enjoining employer from prohibiting union insignia because employer could not prove any legitimate reason for the prohibition); *Adams v. Fed. Express Corp.*, 470 F. Supp. 1356, 1364 (W.D. Tenn. 1979) ("A claim of discharge in violation of § 152 raises the question of the employer's motivation."); *Assoc. Pilots of Alaska Int'l Air, Inc. v. Alaska Int'l Air, Inc.*, 96 L.R.R.M. (BNA) 3233, 1976 WL 1714, at *2-3, *6 (D. Alaska 1976) (concluding that the plaintiffs had shown a probability of success because they established that union activity was a substantial motivating factor in determining who would be laid off); *Lum v. China Airlines Co.*, 413 F. Supp. 613, 617 (D. Haw. 1976) (finding a § 152, Fourth violation because plaintiff was discharged for his union activities); *see also Newlin v. Gojet Airlines, LLC*, No. 10-1458, 2011 WL 743081, at *1-2 (E.D. Mo. Feb. 24, 2011) (describing plaintiff's § 152, Third and Fourth claim that she was discharged in retaliation for her union activities); *SkyWest Pilots ALPA Org. Comm. v. SkyWest Airlines, Inc.*, 182 L.R.R.M. (BNA) 2485, 2007 WL 1848678, at *12-13 (N.D. Cal. 2007) (parties conceded that employer violated the RLA if it applied its policy prohibiting non-company lanyards in a discriminatory manner); *IAM v. Nw. Airlines, Inc.*, No. 86-821, 1988 WL 152017, at *1 (D. Minn. Mar. 25, 1988) (noting the plaintiffs' allegations that they were discharged for attempting to organize a union in violation of § 152, Third and Fourth).

interests that it may be deemed proscribed without need for proof of an underlying improper

motive." *Id.* at 33 (citation and quotations omitted).   But the Court further held that, "once it has

been proved that the employer engaged in discriminatory conduct which could have adversely

affected employee rights to some extent, the burden is upon the employer to establish that he was

motivated by legitimate objectives since proof of motivation is most accessible to him." *Id.* at

34.   In other words, although (under the NLRA) a plaintiff need not offer proof of anti-union

motivation in cases involving "inherently destructive" employer action, the employer can still

defend itself — and escape liability — by proving that it had a legitimate motive.

In *Atlas Air, Inc. v. Air Line Pilots Association*, 232 F.3d 218 (D.C. Cir. 2000), the D.C.

Circuit declined to decide whether, under the RLA, there is similarly a class of "inherently

destructive" acts.   *Id.* at 225.   Noting that most acts found to be "inherently destructive" have

been those that discriminate solely on the basis of union membership, the court instead read

*Great Dane* to illustrate "the concept that the very nature of actions against unionized labor by an

employer can in and of itself provide evidence of the animus generating those acts."   *Atlas Air*,

232 F.3d at 225-26.

The Court agrees with the D.C. Circuit's application of *Great Dane* in the RLA context.

*Great Dane* chose to identify a facially discriminatory act as "inherently destructive" and

therefore presumably unlawful.   But *Great Dane* did not hold that an act taken *without* anti-union

animus was unlawful; to the contrary, *Great Dane* clearly permits the employer to defend itself

with evidence that it was not motivated by anti-union animus when it acted in a facially

discriminatory manner.   What *Great Dane* seemed to hold was that some acts are so "inherently

destructive" that, in and of themselves, they provide sufficient evidence of anti-union animus.   In

short, in a case involving an "inherently destructive" act — just as in a case not involving an "inherently destructive" act — a lack of anti-union animus on the part of the employer is a defense to liability.  The only difference between the two types of cases is that, when the employer commits an "inherently destructive" act, the employer bears the burden of proving that it did *not* act with anti-union animus.[11]

At least for purposes of plaintiffs' motion for a preliminary injunction, then, the Court agrees that Delta should bear the burden of proof on the issue of intent.  The Court will find that plaintiffs are likely to succeed on the merits of their claims under the RLA unless Delta can show that its actions were likely not motivated by anti-union animus.

As discussed earlier, Delta contends that it did not align the flight attendants' compensation because, under the law, it was forbidden to do so — specifically, that because the AFA's charges of election interference were pending before the Board, Delta had to maintain laboratory conditions, and aligning the compensation of flight attendants would have violated that requirement.  The parties put a lot of effort into arguing whether Delta's position is legally correct — that is, into arguing whether the need to maintain laboratory conditions in fact required Delta to maintain separate compensation systems.  Again, though, the issue in this case is not whether the need to maintain laboratory conditions *precluded* Delta from aligning the pay of flight attendants, but whether Delta *believed* that the need to maintain laboratory conditions

---

[11]*Great Dane* went on to explain that, even where the employer can articulate a legitimate reason for its actions, the NLRB nevertheless has the power "to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy."  *Great Dane*, 388 U.S. at 33-34.  In light of the differences between this Court's role and that of an administrative agency, however, the Court does not believe that it is appropriate to import this balancing test into the Court's consideration of plaintiffs' RLA claims.

precluded it from aligning the pay of flight attendants.  Of course, whether and how clearly the

laboratory-conditions requirement precluded Delta from aligning the pay of flight attendants is

*evidence* of whether Delta believed that it was precluded.  Ultimately, though, what matters is not

what the law required, but what Delta believed the law required.

The Board has said that "[c]hanges in working conditions during the laboratory period

may taint laboratory conditions, except if the changes were planned before the laboratory

conditions attached, or there is clear and convincing evidence of a compelling business

justification."  *Mercy Air Serv., Inc.*, 29 N.M.B. 55, 73 (2001) (citation and quotations omitted).

Delta argues that, under Board precedent, it would have tainted the laboratory conditions to grant

new, unplanned benefits to a group of flight attendants shortly after those flight attendants voted

against union representation.  But plaintiffs disagree, arguing that because Delta planned to align

the compensation of flight attendants before the laboratory-conditions requirement attached,

Delta's following through on its plan would not have tainted laboratory conditions.

Plaintiffs seem to misunderstand or mischaracterize Delta's plan.  Delta has indeed

asserted on many occasions that it plans to align the compensation of flight attendants as soon as

possible.  But this is not the same as asserting that it plans to align the compensation of flight

attendants the moment that the Northwest flight attendants are no longer covered by a CBA.  To

the contrary, Delta has consistently maintained that it will align the compensation of flight

attendants as soon as possible *after the issue of representation has been fully and finally*

*resolved.  See, e.g.*, McMahon Decl. Ex. 1 (memo from Delta to flight attendants stating that

"[a]s we've consistently said since the merger, it is our desire to align all aspects of flight

attendant pay, benefits, work rules and seniority as quickly as possible, but we cannot [do that]

until representation is finally resolved, and we will not 'cherry pick' — pay (including profit sharing), benefits and work rules all affect each other and must be aligned as a package — not individual items").

That this has always been Delta's plan is underscored by Delta's similar treatment of other groups of workers during the merger.  *See* Kight Decl. ¶ 6 ("[Northwest] employees in other work groups received Delta's pay structure only when representation issues were finally resolved and Delta could commence the process of aligning the rest of their package of pay, benefits and work rules.").  Notably, so far as it appears from the record, Delta has consistently waited until representation issues were finally resolved before aligning compensation — and has done so regardless of how the representation issues were resolved.  *See* Kight Decl. ¶ 6 ("[Northwest] pilots and flight dispatchers, who continue to have union representation post-merger, did not receive stand-alone pay increases before Delta began the process of completely aligning their package of wages, benefits and work rules. . . . The same approach was applied for other work groups where [Northwest] union representation was terminated, . . . but only after representation issues were finally resolved by the NMB.").

Delta has also been consistent in honoring the provisions of former CBAs — that is, in maintaining two separate compensation systems — before representation issues are finally resolved.  Delta has honored former CBAs not only when those CBAs provide for *lower* pay or benefits to former Northwest employees (as is true in the case of the flight attendants), but when those CBAs give former Northwest employees *higher* pay or benefits than their Delta counterparts.  *See* Kight Decl. ¶¶ 4(a), 8 (Northwest flight attendants received a two percent pay increase on January 1, 2011 in accordance with the former CBA and Delta made a $13 million

lump-sum payment to Northwest ramp and store employees on December 30, 2010 pursuant to a former CBA).  This evidence undercuts any inference that Delta's policy of waiting until representation issues are fully and finally resolved before aligning compensation is somehow an attempt at unlawful influence or coercion.  *Cf. Auto., Petroleum & Allied Indus. Emps.' Union v. Trans States Airlines*, 926 F. Supp. 869, 873-74 (E.D. Mo. 1996) (suspension of annual merit raises following certification of union did not violate RLA because employer's intent was to avoid "bid[ding] against itself" in forthcoming negotiations and to avoid allegations that individual grants or denials of raises were based on anti-union animus).

Based on the limited record before the Court, it appears that Delta has consistently represented that it would align the compensation of any particular group of workers only after representation issues regarding that group have been resolved, and that Delta has acted consistently with its representations.  It thus seems eminently reasonable for Delta to be concerned that if it made an exception — if, contrary to its representations and contrary to its practice with respect to other groups of employees, it aligned the compensation of Northwest flight attendants before representation issues were resolved — Delta would open itself up to charges of interference.  *See Mercy Air Serv., Inc.*, 29 N.M.B. at 73 (the grant of unplanned benefits may constitute interference); *cf. N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964) ("The danger inherent in well-timed increases in benefits is the suggestion of a fist inside the velvet glove. ").

The reasonableness of Delta's interpretation of the laboratory-conditions requirement is bolstered by the fact that *the AFA itself* initially took the position that Delta had to abide by the terms of the Northwest CBA while the AFA's interference charges were pending before the

Board.  In a letter to the Board sent immediately after the election, the AFA cited Delta's

statement that it would not be able to align pay and benefits while interference claims were

pending, and, far from disputing that statement (as plaintiffs do now), the AFA agreed "that the

status quo working conditions must be maintained during the Board's investigation of carrier

interference."[12]  Bowman Decl. Ex. A.  Likewise, after a different group of Delta workers

rejected union representation in a Board-conducted election, the International Association of

Machinists ("IAM") contended that Delta had to make contributions to the Northwest employees'

pension plan and grant other benefits secured by the previous CBA while interference charges

were pending.  Kight Decl. ¶ 8 & Ex. A.  Notably, Delta acceded to the IAM's request.  Kight

Decl. ¶ 8.  Delta's position that it cannot align the compensation of the flight attendants until the

Board resolves the pending interference charges may be incorrect, but it is very difficult to

conclude that Delta's position is unreasonable when two unions — including the AFA, plaintiffs'

former union — have taken exactly the same position in the past.

Plaintiffs nevertheless contend that Delta's professed concern about violating laboratory

conditions is pretextual.  First, plaintiffs argue, Delta's concern is spurious because the AFA has

repeatedly offered to waive any potential claims of interference based on the alignment of pay

and profit sharing between Northwest and Delta flight attendants.  Citing § 17.0 of the Board's

representation manual,[13] plaintiffs contend that the AFA is the only entity that has standing to

---

[12]Plaintiffs point out that the AFA's letter must be read in light of its purpose, which was to convince the Board not to extinguish the AFA's certification.  At oral argument, however, plaintiffs admitted that a reasonable reading of the letter is that the AFA agrees with Delta that laboratory conditions require Delta to continue to abide by the CBA.

[13]*National Mediation Board Representation Manual* (Mar. 21, 2011),

(continued...)

bring interference charges, and thus the AFA's waiver means that "there is no possible way that the alignment of pay could result in an interference charge."  Docket No. 6 at 12.  Plaintiffs may be right that the AFA is the only entity that has standing to bring interference charges before the Board (although § 17.0 of the Board's manual does not say that), but the AFA is certainly not the only entity that has standing to bring interference charges in federal court.  As the Court discussed above — and as this very case demonstrates — federal courts have jurisdiction to hear interference claims brought by individual employees.  Thus, the AFA's "waivers" were largely meaningless; they surely did not insulate Delta from claims of interference.

Plaintiffs next argue that Delta's public statements blaming the AFA for Delta's inability to align pay is evidence of Delta's anti-union motives.  Plaintiffs cite several cases decided under the NLRA in which courts have found that statements blaming the union for the employer's inability to grant pay increases were evidence of anti-union animus.  *See Sara Lee Bakery Grp. v. N.L.R.B.*, 61 Fed. Appx. 1, 8 (4th Cir. 2003) (per curiam); *Borman's, Inc.*, 296 N.L.R.B. 245, 1989 WL 224271, at *6 (1989).[14]  Although Delta's statements are similar to statements that (rightly or wrongly) have been found to violate the NLRA, the Court does not believe that, under the facts of this case, Delta's statements establish a violation of the RLA.

Undoubtedly, Delta's statements evince hostility toward the AFA.  But the fact that Delta does not like the AFA does not mean that everything Delta does is motivated by anti-union

---

[13](...continued)
http://www.nmb.gov/representation/representation-manual.pdf.

[14]Plaintiffs also cite *National Labor Relations Board v. Promedica Health Systems, Inc.*, 206 Fed. Appx. 405 (6th Cir. 2006).  In *Promedica*, however, the Sixth Circuit overturned the NLRB's finding that the employer's statements violated the NLRA.  *Id.* at 415.

animus.  The question before the Court is whether a particular decision of Delta — its decision
not to align the compensation of flight attendants — was motivated by anti-union animus.  Given
what appears to be undisputed evidence that Delta's consistent practice has been to wait to align
pay, benefits, and work rules for all groups of employees until after the representation issues have
been resolved — regardless of the outcome of the issues, and regardless of whether Delta's
practice resulted in more or less favorable treatment of unionized employees — the Court does
not believe that Delta's anti-AFA statements establish that its decision to delay the alignment of
flight-attendant compensation was motivated by anti-union animus.  That is particularly true
given that the AFA itself once expressed agreement with Delta's understanding of what the need
to maintain laboratory conditions required.

Plaintiffs' final argument is that Delta's assertion that it must honor the former CBA until
the representation issue is fully resolved is pretextual because Delta has already deviated from
the CBA in a number of respects.  Specifically, plaintiffs claim that Delta has (1) stopped
processing grievances according to the CBA; (2) stopped scheduling flight attendants according
to the CBA; (3) failed to follow a CBA provision that gave Northwest flight attendants the right
to participate in the more lucrative Delta profit-sharing plan; and (4) implemented a voluntary
severance program that is not authorized by the CBA.

Before the Court addresses the specifics of plaintiffs' arguments, it is important to note
that the parties to a contract often dispute the meaning of particular terms.  The fact that the
parties to a contract disagree about what a provision of the contract requires does not mean that
either of the parties is not committed to honoring the contract.  It simply means that the parties
have different understandings of some of the language in the contract.

-30-

As Delta points out, the flight attendants' interlocking system of compensation, benefits, seniority, and work rules is very complex, *see* Watson Decl. ¶¶ 4, 7 & Ex. C, and disputes over the meaning of particular terms are inevitable.  Although plaintiffs have identified a handful of instances in which they believe Delta violated the CBA, Delta has submitted evidence that it has complied with over 80 different work rules required under the CBA, many of which differ in material respects from their non-CBA counterparts.  Watson Decl. ¶ 4 & Ex. C.  Even if Delta is found to be technically out of compliance with a couple of the provisions of the CBA, it does not necessarily follow that Delta is lying when it asserts its belief that, in order to maintain laboratory conditions, it must continue to compensate Northwest flight attendants under the terms of the CBA.  With this context in mind, the Court turns to plaintiffs' allegations regarding Delta's failure to comply with the CBA.

Plaintiffs first argue that Delta has stopped processing grievances.  As the RLA requires, the CBA provides for a comprehensive, multistage grievance process.  *See* Watson Decl. Ex. A §§ 27-28 (CBA provisions governing grievance procedures and the parties' system board of adjustment); 45 U.S.C. § 184 (requiring the establishment of a system board of adjustment to determine grievances).  Therefore, plaintiffs contend, if Delta sincerely believed that it was bound to honor the CBA, it would not have stopped following the CBA's grievance process.

The problem with plaintiffs' argument is that the CBA's grievance process assumes the existence and participation of a union.  Following the decertification of the AFA, Northwest flight attendants have not been represented by a certified union.  In the absence of a certified union, it is simply not possible for Delta to fully comply with the grievance procedures set forth in the CBA.

Plaintiffs contend that Delta could nevertheless follow the *initial stages* of the CBA's grievance procedure, in which the participation of the union is permitted but not required. Delta responds that the initial stages of its non-contract dispute-resolution process do not differ in any material respect from the initial stages of the CBA grievance process. Delta also points out that it has worked with the AFA since the union was decertified to address the grievance procedure (and other types of transition issues), and the AFA has not once complained about Delta's failure to follow the CBA's grievance process. Watson Decl. ¶ 3 & Ex. B. Given the state of the record, the Court is not in a position to resolve the factual dispute over the extent to which the initial stages of Delta's non-contract dispute-resolution process mimic the initial stages of the CBA's grievance process. But keeping in mind that the point of this evidence is to gauge whether Delta's professed concern about laboratory conditions is pretextual, Delta's cooperation with the AFA to address the grievance procedure and the lack of complaints from the AFA substantially undermine any inference of pretext.

Plaintiffs next argue that Delta no longer schedules flight attendants according to the CBA. Delta contends that plaintiffs are simply mistaken. Although the record is sparse, Delta appears to have the better of the argument. Plaintiffs rely on a single, conclusory assertion that Delta "is no longer scheduling flight attendants pursuant to the Northwest CBA." McMahon Decl. ¶ 6. Delta, in contrast, has submitted a declaration asserting that (1) the Northwest manager responsible for scheduling prior to the merger continues to support scheduling; (2) scheduling is primarily done by computer, and Delta has not made material changes to the computer program used to schedule Northwest flight attendants both before and after the merger; and (3) the number of "scheduling resolutions requests" (65) that arose in the four-month period

from January 1, 2011 through April 30, 2011 is comparable to the number of "work rule grievances" (85) that arose in the four-month period leading up to the election.[15] Watson Decl. ¶¶ 5-6. It thus appears likely that Delta continues to comply with the scheduling provisions of the CBA.

Plaintiffs next contend that, under the terms of the Northwest CBA, they are entitled to share in the more lucrative profit-sharing distribution given to the Delta flight attendants. Plaintiffs rely on the following language from the CBA:

> [I]f a Participant is eligible to receive an award under another incentive program maintained by the Company during a Plan Year, such Participant will be eligible to participate in the Plan during such Plan Year if the amount of such Participant's Award is greater than the amount such Participant would receive under such other incentive programs, in which event such Participant would cease to be eligible to participate in such other incentive program . . . .

McMahon Second Decl. Ex. 1 § 3.1. Under this provision, plaintiffs argue, flight attendants who are eligible for multiple profit-sharing plans are to be paid under the more generous plan. Delta's failure to follow this provision, plaintiffs contend, is evidence of pretext.

Plaintiffs are wrong on both counts. First, the plain language of the provision operates to make a participant eligible for the "Plan" — that is, the profit-sharing plan *established under the CBA* — in the event that (1) the participant is eligible for some other plan and (2) the CBA's plan is a better deal. This language does not purport to give an employee an entitlement to participate in some other plan. Second, even if plaintiffs' interpretation were correct, Delta's interpretation is at least reasonable; it is, after all, shared by this Court. Thus, Delta's failure to allow the

---

[15]In the context of the declaration, it appears that "work rule grievances" and "scheduling resolutions requests" are both referring to scheduling disputes.

former Northwest flight attendants to participate in the Delta profit-sharing plan is not evidence of pretext.

Finally, plaintiffs argue that, contrary to its position that it cannot grant new benefits until representation is resolved, Delta recently offered a temporary, voluntary severance program for which both Northwest and Delta flight attendants were eligible. *See* McMahon Second Decl. ¶ 4 & Ex. 3. Delta's grant of this benefit does indeed appear to conflict with Delta's position about the need to maintain laboratory conditions.[16] As Delta points out, though, Northwest flight attendants who elected to take the severance package will receive subsidized retiree medical benefits consistent with the former CBA, whereas Delta flight attendants who made a similar election will receive no such benefits. Kight Decl. ¶ 10. Thus, even if Delta's offer of the severance package was technically inconsistent with its position about the need to maintain laboratory conditions, Delta at least appears to have tried to comply with its obligations under the former CBA.

Moreover, even under Delta's strict interpretation of the laboratory-conditions requirement, an employer retains the ability to respond to business necessities. *Cf. Delta Air Lines, Inc.*, 37 N.M.B. 281, 307 (2010) (where there is clear and convincing evidence of a compelling business justification, changes in pay do not taint laboratory conditions). The record contains little evidence about whether business necessities prompted the severance program. But it seems to the Court that a one-time, short-term offer of a voluntary severance package in order to entice some employees to retire is more likely to be found not to interfere with laboratory

---

[16]The Court's consideration of the importance of this evidence is hampered by the fact the program was first announced after plaintiffs had already filed their initial memorandum and thus the parties have not had an opportunity to fully brief this issue.

conditions than sweeping changes to the compensation, benefits, seniority, and work rules applicable to thousands of employees. At least at this early stage of the proceedings and without the benefit of more extensive briefing, the Court is not persuaded that Delta's offering of the severance program demonstrates that its longstanding position about its obligation to maintain laboratory conditions is pretextual.

In sum, the Court finds that plaintiffs are not likely to prevail on their claims. The evidence in the record indicates that the disparity in Delta's treatment of Northwest and Delta employees is likely motivated by a legitimate and reasonable understanding of the laboratory-conditions requirement. Although there is some evidence that Delta may have deviated from the Northwest CBA in a couple of respects — and there is certainly evidence demonstrating Delta's hostility toward the AFA — the Court does not believe that this evidence demonstrates that Delta's concern about laboratory conditions is likely pretextual.

## 2. Remaining Factors

In addition to plaintiffs' likelihood of success on the merits, the Court must also weigh the threat of irreparable harm to plaintiffs, the balance between that harm and the harm that granting the injunction would inflict on Delta, and the public interest.

Even though the Court does not believe that plaintiffs have standing to seek relief on behalf of third parties (for the reasons described above), the Court may nevertheless consider the impact of Delta's actions on those third parties in determining whether plaintiffs face a threat of irreparable harm. *See Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 938-39 (9th Cir. 1987). Plaintiffs have submitted e-mails from Northwest flight attendants chastising the AFA for pursuing interference claims and blaming the AFA for depriving the flight attendants of better

compensation.  *See* Gilmartin Second Decl. Ex. 1.  Although few in number, these e-mails reflect resentment of the AFA, and some of the authors of these e-mails suggest that their feelings are widespread.

The Court does not doubt that plaintiffs are threatened with some degree of irreparable harm.  The Court also does not doubt that, if plaintiffs were likely to succeed on the merits of their claims, the public interest would favor the issuance of an injunction.  But at this point it appears to the Court that the plaintiffs are not likely to succeed on the merits, and thus the Court does not believe that either the threat of irreparable harm or the public interest justifies the entry of a preliminary injunction.  The Court's conclusion is bolstered by the fact that plaintiffs' broader interest in protecting their right to unionize — as opposed to their narrower interest in not being denied pay for discriminatory reasons (which can be adequately addressed by an award of damages) — is in the process of being addressed by the Board.

The Court also finds that the balance of harms does not favor plaintiffs.  If the Court were to order Delta to grant pay raises and a larger profit-sharing distribution to plaintiffs, and Delta were later to prevail in this litigation, Delta would be unlikely to be able to recoup its losses.  Moreover, any attempt by Delta to recoup its losses would likely have a more destabilizing effect than would delaying any monetary recovery to which plaintiffs eventually prove themselves entitled.[17]  The Court therefore denies plaintiffs' motion for a preliminary injunction.

---

[17]This would be particularly true if the Court were to grant plaintiffs' request for an injunction covering all Northwest flight attendants.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.    Plaintiffs' motion for preliminary injunction [Docket No. 5] is DENIED.

2.    Defendant's motion to dismiss [Docket No. 17] is DENIED.

3.    Defendant's alternative Rule 12(f) motion to strike claims for relief on behalf of

non-parties [Docket No. 17] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  November  16 , 2011                         s/Patrick J. Schiltz
                                                    Patrick J. Schiltz
                                                    United States District Judge